**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Renard Leon CHERRY, a/k/a**
**Jimmy Dean, In Custody,**
**Defendant–Appellant.**

**No. 94–20456.**

United States Court of Appeals,
Fifth Circuit.

April 11, 1995.

---

Stanley G. Schneider, Houston, TX, for appellant.

Katherine L. Haden, Paula Offenhauser, Asst. U.S. Attys., Gaynell Griffin Jones, U.S. Atty., Houston, TX, for appellee.

Before WISDOM, KING and GARWOOD, Circuit Judges.

WISDOM, Circuit Judge.

The defendant-appellant, Remard Leon Cherry, alias "Jimmy Dean", appeals from his conviction of conspiracy to possess with the intent to distribute crack cocaine, of possession with the intent to distribute crack cocaine, and of use of a firearm during the commission of a drug trafficking crime. We affirm the defendant's conviction and sentence.

I

Following a traffic stop in October 1993, Constable Craig Lawson of the Montgomery County, Texas police department arrested Bervick Williams, and seized from him a marijuana-laced cigar and half an ounce of crack cocaine. Williams told Lawson that he had purchased the crack cocaine that morning from "Jimmy Dean" at 5900 Selinsky Street # 99, in Houston, Texas.

In cooperation with the Montgomery County police, Williams made a controlled delivery of the crack cocaine to a man in Livingston, Texas. By written statement, Williams said that he had purchased the crack cocaine from Jimmy Dean, a Houston

crack dealer. Williams said he had known Jimmy Dean for about two and a half years, that Jimmy Dean sells crack cocaine, and that he bought crack cocaine from Jimmy Dean nearly every day. Williams said that he had seen as much as a kilo of cocaine in a bowl in Jimmy Dean's kitchen cabinet. Williams said that Jimmy Dean owned a black Chevrolet Stepside truck, two Lexus, a Jeep Cherokee, and a blue five-liter-engine Mustang. Williams also said that Jimmy Dean kept a Rottweiller in the apartment to guard the cocaine. In addition, Williams orally described Jimmy Dean as being 26 or 27 years old, 5'9" to 5'10", around 275 pounds, medium complexioned, with a short afro and a gold tooth. Williams also said that he had seen about a kilo of cocaine at 5900 Selinsky # 99 that day, October 13.

Officer Lawson relayed this information to Officer Jimmy Turpin, a Houston Narcotics Officer. Officer Turpin went to 5900 Selinsky Street and found the building to look as Williams had described it. Apartment records listed Remard Leon Cherry as the lessee of 5900 Selinsky Street # 99. A criminal history report on "Jimmy Dean" from the Houston Police Department ("HPD") computer revealed that Remard Leon Cherry used "Jimmy Dean" as an alias and had occupied at one time the apartment at 5900 Selinsky Street # 79.

Based on this information and his own observations, Officer Turpin drafted a search warrant for the apartment, and a magistrate signed the warrant on October 14, 1993. Following the signing of the warrant, Houston narcotics officers placed the apartment on surveillance. In the afternoon of October 14, 1993, one of the officers saw a black Chevrolet Stepside truck arrive at the apartment complex. An African–American male entered apartment # 99 with a key, and five minutes later left the apartment in the truck. Officers followed the truck to various locations. At one of the stops, officers were able to observe the driver and found his physical appearance similar to the description given by Williams to Officer Lawson. The defendant eventually went to 8601 Broadway, and entered apartment # 4247. Parked outside the apartment was a blue five-liter-engine Mustang. After five minutes, the defendant stepped out of the apartment, appeared to roll a marijuana cigarette, and went back to the apartment. One minute later he left the apartment holding what looked like a cigar. He drove away, and officers stopped the truck as it left the apartment complex. After the officers discovered a marijuana cigar on the floorboard of the truck, they arrested Cherry, read him his *Miranda* rights, and he waived his *Miranda* rights.

The officers took the defendant to 5900 Selinsky # 99 and opened the door with the defendant's key. The defendant tied up the Rottweiller, and the officers seized from the apartment a total of 134.9 grams of crack cocaine and 4.5 kilos of cocaine, of which 3.2 kilos were pure cocaine.

The defendant entered a plea of not guilty and filed a motion to suppress the evidence seized from 5900 Selinsky # 99, on the ground that the search warrant was invalid. The defendant argued that the warrant affidavit contained misrepresentations and that Officer Turpin intentionally had misled the court by misdescribing the defendant's physical characteristics and his place of residence.

The district court concluded that the search warrant was valid and denied the defendant's motion to suppress. So that he could appeal the ruling on the motion to suppress, the defendant agreed to waive a jury and to have his case tried on stipulated facts. The court found Cherry guilty of conspiracy to possess and distribute crack cocaine, of possession with intent to distribute crack cocaine, and of use of a firearm during the commission of a drug trafficking crime. Before sentencing, the defendant filed an objection to the presentencing report, arguing that the Sentencing Guidelines' penalty scheme violated his Fifth Amendment right to equal protection of the laws. The court overruled the objection and sentenced him in the middle of the Guideline range to 166 months imprisonment on counts one and two to run concurrently, five years imprisonment to run consecutively on count three, and five years of supervised release. The defendant appeals his conviction and sentence.

## II

The defendant raises two arguments on appeal. First, the defendant argues that the search warrant was invalid and that the district court erred in denying his motion to suppress the evidence. Second, the defendant argues that the provisions of 21 U.S.C. § 841(a)(1) and § 2D1.1 of the Sentencing Guidelines violate the Fifth Amendment's guarantee of equal protection because the provisions punish far more severely the possession of crack cocaine than the possession of ordinary cocaine. We affirm the defendant's conviction and sentence.

## A

The defendant's first argument on appeal challenges the validity of the search warrant and contends that the district court erred in denying the defendant's motion to suppress the evidence. The defendant argues that the affidavit supporting the warrant to search 5900 Selinsky # 99 contained intentional misrepresentations. The defendant argues that the affiant, with the intent to deceive the court, intentionally misrepresented the defendant's physical appearance and home address. The district court concluded that the challenged statements were not misrepresentations and denied the motion to suppress. We agree with the conclusion of the district court.

■■■ In determining whether a search warrant establishes probable cause, a court must disregard any intentional or reckless misrepresentations made by the affiant in the affidavit.[1] A statement in a warrant affidavit is not false, however, merely because it characterizes or summarizes facts in a particular way; if a statement can be read as true, it is not a misrepresentation.[2] Further, a search warrant is valid, even if it contains a misrepresentation, if after striking the misrepresentation, there remains sufficient content to support a finding of probable cause.[3] Proba-

ble cause is evaluated in the totality of the circumstances.[4]

■■■ The defendant argues that the affidavit contains misrepresentations, and that if the misrepresentations were deleted from the affidavit, the affidavit would not have provided probable cause to support the warrant to search 5900 Selinsky # 99. The defendant's argument rests on discrepancies between Officer Turpin's affidavit and the HPD criminal history report regarding the defendant's physical appearance and his residence address.

Officer Turpin's affidavit describes the defendant as an African–American male, 26 to 27 years old, 5'9" to 5'10" tall, 275 to 280 pounds, medium complexioned, with a short afro and one gold tooth. The HPD criminal history report describes the defendant as an African–American male born in 1970, 6' tall, 185 pounds, with a medium complexion and black hair. In reality, the defendant has three gold teeth.

Although the informant misestimated Cherry's height and weight, the informant correctly estimated and described the defendant in many other respects. Williams correctly stated that Cherry is an African–American male, has a gold tooth, is in his mid-twenties, has short black hair, and uses the alias "Jimmy Dean". Williams correctly described the apartment at 5900 Selinsky and all of the cars and trucks that the police observed during their surveillance. We conclude that the informant's misestimation of the defendant's physical appearance is not an intentional misrepresentation.

■■■ The second alleged misrepresentation stems from a discrepancy between the affidavit and the HPD criminal history report's description of the defendant's home address. Officer Turpin's affidavit states the defendant's home address as 5900 Selinsky # 79, and the defendant argues that this is intentionally deceptive because that was not his

---

1. *United States v. Singer,* 970 F.2d 1414, 1416 (5th Cir.1992).

2. *Id.* at 1417 (quoting *United States v. Hare,* 772 F.2d 139, 141 (5th Cir.1985)).

3. *United States v. Privette,* 947 F.2d 1259, 1261 (5th Cir.1991), *cert. denied,* 503 U.S. 912, 112 S.Ct. 1279, 117 L.Ed.2d 505 (1992).

4. *Id.* (citing *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

home address at the time the warrant was issued. The HPD criminal history report listed the defendant's home addresses as 5900 Selinsky # 118 on July 4, 1989, 5901 Selinsky # 79 on February 25, 1990, and 5900 Selinsky in October and November 1990. The district court concluded that this discrepancy was not deceptive, and we agree. We can read Officer Turpin's statement as true as a way to link the defendant to the location of 5900 Selinsky. Accordingly, we conclude that neither the physical description of the defendant's height and weight nor the location of his home address is an intentional or reckless misrepresentation of fact.

The defendant also makes challenges to the affidavit on matters that he did not raise in the district court. The defendant contends that Williams's written statement does not support Officer Turpin's statements in the affidavit, because Williams's written statement did not reflect the date he saw a kilo of cocaine in the defendant's apartment, did not give the apartment number of the defendant's residence, and did not provide a physical description of the defendant. The defendant's failure to raise this argument in the district court forfeits it on appeal unless there is plain error.[5]

Williams provided both oral and written information to Officer Turpin. Turpin interviewed him more than once, including the day after Williams made his written statement. The defendant's general assertion that the written statement in some way does not provide support for Officer Turpin's affidavit does not rise to the level of plain

error, and we decline to review the merits of this argument.[6]

### B

The defendant's second argument on appeal contends that his sentence was imposed in violation of the law and asks this Court to reverse his sentence. The defendant was sentenced in accordance with U.S.S.G. § 2D1.1(c)(3), and like all the sections of the Drug Quantity Table of the Sentencing Guidelines, section 2D1.1(c)(3) punishes the possession of one gram of crack cocaine the same as it punishes the possession of one hundred times that quantity, 100 grams, of powder cocaine. This 100 to one ratio means that for any given quantity of cocaine, sentences involving crack cocaine are significantly longer and much more severe than those for like offenses involving powder cocaine.

The defendant filed a written objection to the presentencing report, contending that § 2D1.1 violates the Fifth Amendment's guarantee of equal protection. The defendant argues that the penalty scheme disproportionately burdens African–Americans and that Congress enacted the scheme with the intent to discriminate on the basis of race. The district judge overruled the objection, stating that he was "bound by what Congress has done before".[7] On appeal, the defendant asks this Court to strictly scrutinize the penalty scheme. We review the district court's legal conclusions de novo, and will uphold the district court's factual finding if it is supported by substantial evidence.[8]

---

5. *United States v. Maldonado*, 42 F.3d 906 (5th Cir.1995); *United States v. Calverley*, 37 F.3d 160, 162 (5th Cir.1994) (en banc), *cert. denied*, —— U.S. ——, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995).

6. To be reviewable under the plain error standard, three requirements must be met: first, there must be error, a deviation from a legal rule in the absence of a valid waiver. Second, the error must be plain; it must clear and obvious. Third, the error must affect substantial rights, and the defendant has the burden to show that the error was prejudicial. Finally, even if the elements of plain error are met, review of the alleged error is discretionary; an appellate court may, but is not required to, exercise its discretion to correct the assigned error. *Calverley*, 37 F.3d

at 162–64. *See also United States v. Maldonado*, 42 F.3d 906 (5th Cir.1995).

7. 4 Record at 3.

8. *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 102, 130 L.Ed.2d 50 (1994). The government contends that the defendant failed to raise "the same specific argument in the trial court that he raised on appeal", and that under *Calverley*, 37 F.3d at 162–64, we must review this argument for plain error. We do not agree. The defendant's written objections to the presentence report are in the record. Unlike the arguments in *Calverley*, which were never presented to the district court, the defendant in this case raised the objection in the district court. The defendant

It is true that the Sentencing Guidelines punish far more severely the commission of crimes involving crack cocaine than those involving other forms of cocaine. It also may be true that African–American criminal defendants are disproportionately affected by the crack cocaine penalties. In 1992, over ninety percent of the defendants federally prosecuted for crimes involving crack cocaine were African–American.[9] In 1993, over eighty-eight percent of federal crack cocaine distribution convictions involved African–American defendants.[10]

Disproportionate impact alone, however, is not sufficient to trigger the application of strict scrutiny to this penalty scheme. In order to trigger strict scrutiny of a facially neutral law that allegedly discriminates on a racial basis, a litigant must demonstrate that the law is the product of a racially discriminatory purpose, and this is no easy task. The ideal way to demonstrate a racially discriminatory purpose is, of course, through direct evidence of an intent to discriminate. We do not recall instances of legislators willing to declare racially motivated reasons for their legislative action. Things being what they are, we allow a litigant latitude to show discriminatory intent through circumstantial evidence, by demonstrating that "the totality of the relevant facts gives rise to an inference of discriminatory purpose".[11] Foreseeability of a disparate impact,[12] the historical background of the law,[13] a clear pattern that emerges from the effect of the law, unexplainable on grounds other than race,[14] and disparate impact[15] are all relevant to the determination of whether an invidious discriminatory animus motivated the enactment of a law. Impact alone, however, is not determinative,[16] and demonstrating a racially discriminatory intent is a difficult burden to bear. Absent a showing of discriminatory purpose, a law is subject to the test of rationality.[17]

The defendant contends that the enhanced penalty scheme of § 2D1.1 is a product of racial animus. In addition to the obvious disproportionate impact that § 2D1.1 has on African–American criminal defendants, the defendant contends that a media "frenzy" over African–Americans' use of crack cocaine in the inner cities and pressure from the constituency prompted the enactment of the enhanced penalty scheme. The defendant also argues that unconscious bias and a predisposition to racism influenced the enactment of the enhanced penalty scheme.

We find these allegations insufficient to demonstrate that a discriminatory purpose underlies the penalty scheme. It is within the bounds of possibility that the media, the constituency, and conscious or subconscious racism had some effect on the enactment of the penalty scheme of § 2D1.1, but the defendant does nothing to link these assertions to the enactment of the law. Without more, we cannot say that these assertions demonstrate a racially discriminatory intent behind

preserved the issue for appeal, and we will address the merits of his argument.

9. *United States v. McMurray*, 833 F.Supp. 1454, 1460 (D.Neb.1993), *aff'd*, 34 F.3d 1405 (8th Cir. 1994), *cert. denied*, — U.S. —, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995). *See also* Dennis Cauchon, *Balanced Justice?* USA Today, May 26, 1993 at A1 (*citing* the U.S. Sentencing Commission).

10. U.S. Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy*, at xi (Feb. 1995).

11. *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976).

12. *Personnel Administrator v. Feeney*, 442 U.S. 256, 279 n. 25, 99 S.Ct. 2282, 2296 n. 25, 60 L.Ed.2d 870 (1979).

13. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 267, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).

14. *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

15. *Washington v. Davis*, 426 U.S. at 242, 96 S.Ct. at 2049.

16. *Arlington Heights*, 429 U.S. at 267, 97 S.Ct. at 564.

17. *United States v. Galloway*, 951 F.2d 64, 65–66 (5th Cir.1992) (quoting *Rogers v. Lodge*, 458 U.S. 613, 617 n. 5, 102 S.Ct. 3272, 3275 n. 5, 73 L.Ed.2d 1012 (1982)).

the penalty scheme. The penalty scheme is subject to rational basis review.

 This penalty scheme will survive the equal protection challenge if this Court finds the scheme rationally related to a legitimate government purpose.[18] The government asserts that it is reasonable to create different punishments for crimes involving crack cocaine from those involving powder cocaine because crack cocaine can be a more powerful drug than powder cocaine. The government asserts that the purpose of the penalty scheme is to protect the public welfare and that enhancing the penalty for possession of crack cocaine will further that interest.

After carefully examining the record, we are convinced that the legislation at issue is in fact rationally based. Congress had before it a substantial amount of scientific evidence when it enacted the crack cocaine penalty scheme. Congress considered medical testimony that cocaine in any form produces the same effects, but that the effects differ depending on how the cocaine is administered. Smoking crack cocaine produces a maximum psychotropic effect as quickly as one minute after administration. The rapidity of ingestion elicits an extreme response and contributes to the subsequent craving for the drug. Because of the rapidity of ingestion, crack cocaine is considered more addictive than powder cocaine. Crack cocaine is associated with systematic crime related to the drug's trafficking and distribution. Finally, crack cocaine can cause severe side effects, such as a stroke, paranoia, depression, and seizures.[19]

To exacerbate matters, small doses of crack cocaine are sufficient to cause an extreme response. For crack cocaine penalties to have any enforcement and deterrent value, it is rational to conclude that the penalties must reach the small amounts of crack cocaine possessed by many of those who buy, use, and sell crack cocaine. On earlier occasions, this Court has concluded that crack cocaine is a different drug from cocaine, and that Congress need not treat dissimilar drugs similarly.[20]

After a close examination of the record, this Court is convinced that the scheme of § 2D1.1 is rationally related to Congress's legitimate interest in protecting the general welfare. The 100 to one ratio is extreme, but it is not the province of this Court to second-guess Congress's chosen penalty. That is a discretionary legislative judgment for Congress and the Sentencing Commission to make.[21] Our review is limited to whether the penalty has a rational basis. We conclude that it does, and we AFFIRM the judgment of the district court.

---

**18.** *Galloway*, 951 F.2d at 66.

**19.** *See* Matthew F. Leitman, *A Proposed Standard of Equal Protection Review for Classifications Within the Criminal Justice System that Have a Racially Disparate Impact: A Case Study of the Federal Sentencing Guidelines' Classification Between Crack and Powder Cocaine*, 25 U.Tol.L.Rev. 215 (1994) for a discussion of the hearing held by the Senate's Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of July 15, 1986, 99th Cong., 2d Sess. (1986).

**20.** *United States v. Thomas*, 932 F.2d 1085, 1090 (5th Cir.1991), *cert. denied*, 502 U.S. 895, 112 S.Ct. 264, 116 L.Ed.2d 217 (1991); *United States v. Metcalf*, 898 F.2d 43, 46 (5th Cir.1990).

**21.** In 1994, Congress directed the Sentencing Commission to examine the federal sentencing scheme and to provide recommendations for retention or modification of the policy. The Sentencing Commission's report, transmitted to Congress on February 28, 1995, concludes that the 100 to one ratio is too great, and that the penalty scheme should be amended. The Commission took into account the "inescapable conclusion" that African–Americans comprise the largest percentage of those affected by the penalties associated with crack cocaine, and in the months ahead plans to refine the drug guidelines to account for the harms related to cocaine without the "difficulties associated with an automatic 100–to–1 ratio". U.S. Sentencing Commission, *Special Report to the Congress: Cocaine and Federal Sentencing Policy* at xi, xv (1995).