**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Larry Wilson DICKEY, Defendant–
Appellant.**

No. 95–40752.

United States Court of Appeals,
Fifth Circuit.

Dec. 13, 1996.

Paula Camille Offenhauser, Katherine L. Haden, U.S. Attorney's Office, Houston, TX, for plaintiff-appellee.

Richelieu Edward Wheelan, Houston, TX, for defendant-appellant.

Before REYNALDO G. GARZA, JONES and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Larry Wilson Dickey appeals his convictions for manufacturing methamphetamine and firearm violations. Applying the recent Supreme Court decision in *Bailey v. United States*, — U.S. —, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), we find the evidence insufficient to support his firearms conviction under 18 U.S.C. § 924(c)(1) and reverse the two convictions under that statute. Finding

no other reversible error, we affirm all other convictions and sentences.

## BACKGROUND

In June 1994 the Galveston County Narcotics Task Force received an anonymous tip through Houston Crime Stoppers that Dickey was illegally manufacturing methamphetamine. Sergeant Randall Burrows, a Galveston County Sheriff's Deputy assigned to the Narcotics Task Force, went to Dickey's homes[1] at 11:00 p.m. that evening. As Sergeant Burrows walked around the house and trailer, he detected a chemical odor that is normally emitted from methamphetamine laboratories.

Sergeant Burrows then left Dickey's residence and phoned a Drug Enforcement Administration ("DEA") agent, who later joined him at Dickey's at 1:00 a.m. The agents did not detect the chemical odor this time. The agents set up a surveillance of Dickey's house and around 11:00 p.m. the next day they saw a pickup truck parked outside the house. Several plastic garbage bags were in the bed of the truck. The truck left the house five minutes later and they followed it. The truck was stopped and its driver was identified as Joseph Kelly Weber, Dickey's half-brother.

With Weber's consent, the agents examined the garbage bags and found empty chemical containers, including an empty bottle of muriatic acid, a chemical commonly used in clandestine labs. The agents also found filter paper that had a strong residue associated with methamphetamine, empty acid containers and broken glassware. The agents further found a box in the bed of the truck containing trash that had a chemical residue. Weber explained that Dickey had asked him to dispose of the garbage bags.[2] The agents then obtained a search warrant.

Before the warrant was executed, a cooperating individual lured Dickey away from his house so agents could arrest him off the premises. The agents then entered and searched the house and trailer. The trailer contained a methamphetamine manufacturing laboratory. In the laboratory were numerous chemicals used to manufacture methamphetamine, as well as laboratory glassware and equipment. The laboratory also contained nicotinamide and inosito, dilutants used to cut methamphetamine. The agents found various stages of the methamphetamine manufacturing process occurring in the trailer. For example, three jugs of methamphetamine reaction intermediate were in the freezer. Reaction intermediate is a crystalline substance which, when mixed with a solvent and several other ingredients, produces phenyl-2-propanol ("P2P"), a Schedule I controlled substance. P2P is treated with other chemicals to make methamphetamine. Many flasks in the laboratory contained P2P at various stages of the chemical process. The agents recovered 3.35 kilograms of P2P, 570.5 grams of methamphetamine[3] and 11.79 grams of amphetamine from the laboratory. Based on the amount of chemicals and equipment, Dickey was capable of producing 23.5 kilograms of methamphetamine in his laboratory.

Several firearms were found in the house and trailer. An UZI nine millimeter rifle with a 12-inch barrel[4] was found on the bed near a shaving kit containing methamphetamine in the bedroom of the trailer. The agents found a disassembled AMT .380 caliber pistol in the closet. Also found in the bedroom of the trailer were: (1) a Colt .25 caliber semiautomatic pistol; (2) an FEG nine millimeter semiautomatic pistol; and (3) a Mossberg 20-gauge pump shotgun with a short barrel. In the laboratory part of the trailer the agents found a Glock pistol. In the house, the agents found an AA ARMS

---

**1.** Dickey occupied both a house located at 1111 Ninth Street (the "house") and a mobile home at 1118 Eighth Street (the "trailer"). The house and trailer will be referred to collectively as Dickey's "residence."

**2.** Dickey argues that this statement is inadmissible hearsay. His contention is discussed below.

**3.** Methamphetamine is used in five to ten milligram doses.

**4.** The UZI's barrel was less than 16 inches, so the firearm had to be registered with the National Firearms Registration and Transfer Record. 26 U.S.C. §§ 5841, 5845, 5861(d) and 5871.

nine millimeter pistol on top of the refrigerator. With the exception of the AMT pistol, all firearms were loaded and operational.

Dickey was indicted in a six count indictment and charged with: Count 1—Aiding and abetting in the manufacture of methamphetamine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) and (b)(1)(A); Count 2—Aiding and abetting the possession with intent to distribute methamphetamine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) and (b)(1)(A); Count 3—Being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2); Counts 4 and 5—Two counts of carrying or using a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) and 21 U.S.C. § 841(a)(1); and Count 6—Possession of an unregistered firearm in violation of 26 U.S.C. §§ 5841, 5845, 5861(d) and 5871.

A jury found Dickey guilty of all counts in the indictment and the district court sentenced him to life in prison on counts one and two and 120 months in prison on counts three and six, all to be served concurrently. The district court also sentenced Dickey to 120 months on count four and 60 months on count five, to be served concurrent to each other but consecutive to the terms on the other counts. Dickey filed a timely notice of appeal.

## DISCUSSION

Search Warrant

Dickey contends that the affidavit supporting the search warrant was insufficient to establish probable cause because Sergeant Burrows' summary of Weber's statements was in reckless disregard for the truth. Dickey also argues that the district court erred in denying his request for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and for failing to suppress the evidence found in the illegal search of his home.

In his affidavit supporting the search warrant, Sergeant Burrows stated that "Weber advised that his half brother, Larry Wilson Dickey, asked him to dispose of the bags which contained garbage. Dickey and Web-er loaded the garbage into Weber's vehicle." Sergeant Burrows further stated that:

Weber advised that he knew that Larry Wilson Dickey illegally manufactured Methamphetamine and when he arrived at 1111 9th Street, San Leon, he smelled an odor which he recognized as being associated with the manufacture of Methamphetamine inside the residence. Weber contacted Larry Wilson Dickey by phone inside the residence at 1118 8th Street, San Leon. Dickey invited Weber into 1118 8th Street and Weber detected the same odor inside this residence. Weber advised that the odor was so strong that it burned his eyes and he had to leave the residence.

Before trial, Dickey filed a motion to suppress evidence. Attached to his motion was Weber's affidavit, which contradicted Sergeant Burrows' statements. Weber stated that:

Almost all of the statements attributed to me in [Sergeant Burrows'] affidavit were never made by me. Specifically, I never told officers that I recognized the smell of methamphetamine in my brother's house. When asked if I noticed a smell in his house, I said yes, but I did not state that it was the smell of methamphetamine. Nor did I tell the officers that the smell burned my eyes so badly that I had to leave the house. In fact, I went to my brother's house to pick up a hunting rifle to take to San Antonio with me because I intended to leave the next morning to visit my mother there. I spent about two to three hours at my brother's house before the agents stopped me that night.

Finally, I did not tell the agents, as alleged in Sgt. Burows' [*sic*] affidavit, that I went to 1111 9th Street, San Leon, smelled an odor of methamphetamine, and contacted my brother by phone at 1118 8th Street, whereupon I was invited into 1118 8th Street. I simply drove up to my brother's house that night and knocked on the door and entered.

■ A defendant is entitled to an evidentiary hearing on a motion to suppress evidence if he shows that: (1) allegations in a supporting affidavit were a deliberate false-

hood or made with a reckless disregard for the truth and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause. *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684. "Even if the defendant makes a showing of deliberate falsity or reckless disregard for the truth by law enforcement officers, he is not entitled to a hearing if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause. *United States v. Privette*, 947 F.2d 1259, 1261 (5th Cir.1991) (citing *Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85) (quotation marks omitted), *cert. denied*, 503 U.S. 912, 112 S.Ct. 1279, 117 L.Ed.2d 505 (1992).

Therefore, we must consider the unchallenged portion of the affidavit and determine whether probable cause exists. We evaluate probable cause under a totality of the circumstances test. *United States v. Cherry*, 50 F.3d 338, 341 (5th Cir.1995). An affidavit may form the basis for the issuance of a search warrant if "the magistrate was provided with sufficient reliable information from which he could reasonably conclude that the items sought in the warrant were probably at the location sought to be searched." *United States v. Wake*, 948 F.2d 1422, 1428 (5th Cir.1991) (internal quotation and citation omitted), *cert. denied*, 504 U.S. 975, 112 S.Ct. 2944, 119 L.Ed.2d 569 (1992).

We review *de novo* the denial of a *Franks v. Delaware* evidentiary hearing. *United States v. Mueller*, 902 F.2d 336, 341 (5th Cir.1990). In his affidavit, Sergeant Burrows stated that he is assigned to the Narcotics Task Force to investigate controlled substance offenses. Sergeant Burrows has worked as a Texas Peace Officer for over 17 years and has extensive experience in all types of narcotics investigations, including clandestine laboratory investigations. In the past, Sergeant Burrows had received information from other law enforcement officers, informants and private citizens that Dickey was illegally manufacturing methamphetamine. On June 15, 1994, Sergeant Bur-

rows received a tip from Houston Crime Stoppers that Dickey was illegally manufacturing methamphetamine at his house and trailer. He stated that he went to Dickey's trailer and "positioned himself downwind from the [trailer] and briefly smelled an odor which [he] immediately recognized as an odor emitted during process of manufacturing methamphetamine."

Sergeant Burrows also stated that he saw a pickup truck depart the trailer carrying numerous plastic garbage bags. The truck, driven by Weber, Dickey's half-brother, was stopped and its contents inspected. In the truck Burrows found "several items such as broken laboratory glassware and empty chemical containers which would be found in a clandestine Methamphetamine laboratory."

Considering the totality of the circumstances, we hold that absent the challenged statements there was still probable cause for issuance of the warrant. *See, e.g., United States v. Allison*, 953 F.2d 870, 874 (5th Cir.) (affidavit set forth adequate probable cause when it included affiant's extensive qualifications as a narcotics investigator, his personal phone contact with the defendant, his detection of the odor of methamphetamine coming from the defendant's house, and information supplied by other law enforcement agents and a police informant), *cert. denied*, 504 U.S. 962, 112 S.Ct. 2319, 119 L.Ed.2d 238 (1992), *opinion corrected on reh'g*, 986 F.2d 896 (5th Cir.1993). Accordingly, the district court's denial of the *Franks v. Delaware* hearing was not error.

## Amount of Methamphetamine

Under 21 U.S.C. § 841(b)(1)(A)(viii), a defendant must be sentenced to life in prison if he possesses or manufactures more than 100 grams of methamphetamine and has two or more prior felony drug convictions.[5] Dickey argues that the evidence is insufficient to show that he manufactured or possessed more than 100 grams of methamphetamine. He contends that the evidence is insufficient because the DEA agent did not actually weigh the methamphetamine found, but instead, relying on the size of the containers found and the percentage of metham-

---

**5.** Dickey does not contest the fact that he has two

or more prior felony drug convictions.

phetamine in samples taken, used an equation to calculate the weight.[6] At trial the DEA agent estimated that there were over 500 grams of methamphetamine in the trailer. At the sentencing hearing, the district court found "that the government has sustained its burden of proof of sustaining a showing of somewhere in the neighborhood of 500 grams" of methamphetamine.

The amount of drugs is not an element of the offense, but rather is a sentencing issue. *United States v. Deisch,* 20 F.3d 139, 148 (5th Cir.1994). The district court's determination of drug quantity is reviewed for clear error, and need only be supported by a preponderance of the evidence. *United States v. Gaytan,* 74 F.3d 545, 558 (5th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 77, 136 L.Ed.2d 36 (1996). After reviewing the DEA agent's testimony, we are convinced that the district court did not err in finding that Dickey manufactured or possessed in excess of 100 grams of methamphetamine. Therefore, the district court's imposition of the mandatory sentence of life imprisonment on counts one and two was not error.

Felon in Possession of a Firearm

Basing his argument on the recent Supreme Court decision in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Dickey contends that his conviction for being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), should be reversed because Congress exceeded its authority in passing the statute. Unfortunately for Dickey, our Circuit has settled this issue. In *United States v. Rawls,* 85 F.3d 240, 242–43 (5th Cir.1996), we held that we are bound by the Supreme Court's decision in *Scarborough v. United States,* 431 U.S. 563, 575, 97 S.Ct. 1963, 1969, 52 L.Ed.2d 582 (1977), that the felon in possession of a firearm statute is constitutional under the Commerce Clause. U.S. Const., art. I, § 8.

Hearsay

Dickey argues that the district court erred in allowing Sergeant Burrows to testify

as to what Weber told him. He contends that this statement was inadmissible hearsay. We review evidentiary rulings for abuse of discretion. *United States v. Clements,* 73 F.3d 1330, 1334 (5th Cir.1996).

At trial, Sergeant Burrows testified that, after he stopped the truck, Weber "explained to us that these bags had come from inside the trailer, that his brother, his half brother had asked him to dispose of these garbage sacks." Dickey contends that this testimony is an out-of-court statement offered to prove the truth of the matter asserted. *See* Fed.R.Evid. 801(c) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").

The government argues that the statement was not offered for the truth of the matter asserted (that Dickey asked Weber to throw away the bags). Rather, the government maintains that Dickey's instruction to Weber to throw away the bags was an order which can be neither true nor false. While it may be true that Dickey's statement to Weber was an order, Weber's statement to Sergeant Burrows (which is the relevant statement) was a statement offered for the truth of the matter asserted. The government offered Weber's out-of-court statement that Dickey told him to throw away the bags in order to prove that Dickey told him to throw away the bags. This is classic hearsay.

Holding that the statement was inadmissible hearsay does not end our inquiry. We still must determine whether the admission of the hearsay evidence was harmless. *United States v. Pepper,* 51 F.3d 469, 472 (5th Cir.1995). In this task, we "must consider the other evidence in the case, and then decide if the inadmissible evidence actually contributed to the jury's verdict." *Id.* Harm will be found only if the evidence had a "substantial impact" on the jury's verdict. *United States v. El–Zoubi,* 993 F.2d 442, 446 (5th Cir.1993).

---

**6.** Because of the hazardous nature of the chemicals in the trailer, the laboratory was destroyed after samples were taken. Therefore, the DEA

was not able to make a more accurate measurement, and Dickey was not able to have the evidence independently analyzed.

■ The evidence established that the truck loaded with the bags was parked outside Dickey's trailer. The bags were filled with broken glassware and chemical containers commonly used in clandestine laboratories, and the filter paper in the bags had a strong odor associated with methamphetamine. The other evidence against Dickey, namely, the methamphetamine laboratory found in his trailer, was quite strong. Viewing the evidence as a whole, the inadmissible hearsay had little, if any, effect on the jury's verdict. Therefore, the admission of the hearsay testimony was harmless.

Use of Firearm

■ Dickey was charged with carrying and using a firearm in relation to a drug trafficking crime.[7] The record is devoid of any evidence that Dickey carried any firearm.[8] Therefore, the conviction will be sustained only if the evidence shows he used the firearm in relation to a drug trafficking transaction.

■ Our review of the sufficiency of the evidence is guided by the recent *Bailey* decision, in which the Court made clear that use means use, it does not mean possession. *Bailey v. United States*, —— U.S. ——, ——, 116 S.Ct. 501, 505, 133 L.Ed.2d 472 (1996). *Bailey* involved two defendants convicted of violating § 924(c)(1). A firearm was found in the trunk of one defendant's car when he was arrested with 30 grams of cocaine. The other defendant was arrested in her home. Police found a firearm next to 10.88 grams of crack cocaine, inside a locked trunk in her bedroom closet. The Court held that this conduct was insufficient to prove use. *Id.* at ——, 116 S.Ct. at 509. The Court clarified that use under § 924(c)(1) requires "an active employment of the firearm by the defendant,

a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* at ——, 116 S.Ct. at 505. (emphasis added).

The Court gave examples of conduct that falls under the active-employment standard. For example:

> The active-employment understanding of "use" certainly includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm. We note that this reading compels the conclusion that even an offender's reference to a firearm in his possession could satisfy § 924(c)(1). Thus, a reference to a firearm calculated to bring about a change in the circumstances of the predicate offense is a "use," just as the silent but obvious and forceful presence of a gun on a table can be a "use."

*Id.* at ——, 116 S.Ct. at 508.

The Court contrasted active-employment with the conduct of the *Bailey* defendants. A gun in a trunk or closet was not "use," because:

> [T]he inert presence of a firearm, without more, is not enough to trigger § 924(c)(1).... A defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs or drug proceeds. Storage of a firearm, without its more active employment, is not reasonably distinguishable from possession.

> \*   \*   \*   \*   \*   \*

Some might argue that the offender has "actively employed" the gun by hiding it where he can grab and use it if necessary. In our view, "use" cannot extend to encompass this action. If the gun is not dis-

---

7. 18 U.S.C. § 924(c)(1) provides, in relevant part, that:

Whoever, during and in relation to any ... drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is a short-barreled rifle, ... to imprisonment for ten years.

8. The indictment charges Dickey in the conjunctive (that is, he was charged with carrying *and* using a firearm), while the statute and charge were in the disjunctive (the statute makes it a crime to carry *or* use a firearm and the district court charged the jury that they could convict Dickey if he carried *or* used a firearm). This discrepancy was not improper because a "disjunctive statute may be pleaded conjunctively and proved disjunctively." *United States v. Johnson*, 87 F.3d 133, 136 n. 2 (5th Cir.1996).

closed or mentioned by the offender, it is not actively employed, and it is not "used."

*Id.*

■ The evidence adduced at trial established that Dickey had seven firearms on his property. He had six in the trailer and one in the house. Of the seven guns, the evidence is silent as to specifically where four of them were found. We know only that the Colt .25 caliber, FEG nine millimeter .and Mossberg 20–gauge were found in the bedroom and the Glock was found in the laboratory. There is no testimony in the record as to their exact locations within the bedroom and laboratory, nor is there testimony as to whether they were visible in any way, and we can draw no inferences from the record as to their locations. Additionally, there is no testimony that Dickey did anything with these four firearms in any manner. Therefore, the government failed to carry its burden of proving active-employment of these firearms in relation to a drug trafficking offense. The evidence shows that the AMT .380 caliber was found in the closet. Under *Bailey* the evidence is clearly insufficient to show active-employment of this firearm.

■ We are left with only two firearms: the UZI found on the bed in the trailer and the AA ARMS pistol found on top of the refrigerator in the house. The government argues active-employment because both guns were open and obvious and therefore were displayed. *Id.* ("The active-employment understanding of 'use' certainly includes . . . displaying . . . ."). The government is correct that displaying a firearm can be active-employment. The government is incorrect, however, in its assertion that Dickey displayed either of these two firearms. The act of displaying necessarily implies that there is one to whom the firearm is displayed. That is to say, displaying requires a displayor and a displayee. The evidence offers no support for the contention that there was anyone to whom these firearms were displayed.

The evidence shows that four individuals were at Dickey's residence. As discussed above, his half-brother Weber was at the residence the evening before the raid. The evidence also shows that a man and two women were present during the raid. The man was in the house, one woman was inside the trailer and one woman was outside the trailer. None of these individuals testified at trial, so we do not know whether they saw the firearms. There is no evidence that anyone was in the bedroom when the UZI was on the bed.[9] There is no evidence that anyone saw the pistol on top of the refrigerator.

■ An individual selling drugs who has a firearm openly displayed near him for his customers to see certainly actively-employs a firearm in relation to a drug trafficking offense. *Bailey,* —— U.S. ——, 116 S.Ct. at 508. The facts of this case are quite different. Dickey had an UZI on the bed in the trailer and a pistol on the refrigerator in his house. While the evidence establishes that at least three people were in the house or trailer, there is no evidence that any of those individuals were in the rooms with the firearms or that they saw the firearms. The mere presence of a firearm in order to "embolden or comfort the offender" is not active-employment. *Id.; Johnson,* 87 F.3d at 137. The government failed to prove that Dickey displayed the firearms to anyone.

■ Even if Dickey could be found to have displayed the firearms, there is no evidence that the display was in relation to the offense of manufacturing methamphetamine. While it is clear that Dickey manufactured methamphetamine in the trailer, the record is devoid of any evidence that these firearms were "an operative factor in relation to the predicate offense [i.e., manufacturing methamphetamine]." *Bailey,* —— U.S. at ——, 116 S.Ct. at 505. Of the four individuals at Dickey's residence, only one was ever charged with a crime related to Dickey's drug manufacturing, and those charges were dropped at the initial appearance. There is no evidence in the record that these individu-

---

**9.** There was testimony that Sergeant Burrows, at some time, saw a videotape of unnamed people sleeping in an unnamed part of the trailer at an unnamed time. There was no testimony that the UZI, or any other firearm, was present, let alone openly displayed, in the bedroom at that time.

als were Dickey's co-conspirators,[10] or that they were in any way related to his drug manufacturing enterprise.

Finally, no drug manufacturing activities occurred in the house, so it is unlikely that the pistol on top of the refrigerator, if it was seen, was displayed in relation to a drug trafficking crime.

For these reasons, the evidence is insufficient to prove that Dickey used a firearm in relation to a drug trafficking offense.[11] The convictions as to counts four and five are reversed. Because Dickey is sentenced to life imprisonment on counts one and two, he is not eligible for an enhancement under USSG § 2D1.1(b)(1) for possession of a firearm during a drug offense. Therefore, remand for resentencing is not appropriate. The concurrent sentences under counts four and five are vacated.

## CONCLUSION

In light of *Bailey*, the evidence is insufficient to support Dickey's convictions for using or carrying a firearm in relation to a drug trafficking crime. Accordingly, counts four and five are REVERSED and the sentences VACATED. After considering the record, briefs and oral argument, we find no other reversible error and AFFIRM the convictions and sentences as to all other counts.

**10.** When seeking to introduce Weber's out of court statement, the government did not attempt to argue that Weber was a co-conspirator, thus making his statements non-hearsay. *See* Fed. R.Evid. 801(d)(2)(E).

**11.** This case was tried pre-*Bailey* and the government obviously did not know it would have to meet the higher active-employment standard. Our pre-*Bailey* precedent merely required "evidence that the firearm was available to provide

protection to the defendant in connection with his engagement in drug trafficking." *United States v. Ivy,* 973 F.2d 1184, 1189 (5th Cir.1992) (internal quotation and citation omitted), *cert. denied,* 507 U.S. 1022, 113 S.Ct. 1826, 123 L.Ed.2d 455 (1993). In *United States v. Fike,* 82 F.3d 1315, 1327 (5th Cir.1996), we noted that our prior standard conflicted with *Bailey*'s requirement of active-employment of the firearm. *Bailey,* —— U.S. at ——, 116 S.Ct. at 506.