REVISED AUGUST 22, 2002

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 01-30771**

_____

**UNITED STATES OF AMERICA**

**Plaintiff-Appellee,**

**versus**

**CECIL BROWN,**

**Defendant-Appellant.**

_____

**Appeal from the United States District Court**
**for the Eastern District of Louisiana, New Orleans Division**

_____

July 15, 2002

Before KING, Chief Judge, JONES and DENNIS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Cecil Brown was convicted of extorting money for himself and former Governor Edwin Edwards from businesses seeking to obtain state contracts and licenses in Louisiana. Brown argues on appeal that (1) he was entitled to an evidentiary hearing on his motion to suppress evidence obtained through electronic surveillance because the Government used a false or misleading affidavit to procure the initial wiretap order; and (2) the superseding indictment should have been dismissed because the Government, in violation of the Fifth Amendment's Due Process Clause, engaged in a vindictive

prosecution.  Having reviewed the record, we hold that the district court did not err in denying Brown's motion to suppress evidence or his motion to dismiss the indictment.  The judgment of conviction is AFFIRMED.

## I.    INTRODUCTION

The jury found that, from 1992 to 1997, Cecil Brown acted as a "front man" for Governor Edwin Edwards in a scheme to extort money from companies that needed to obtain state approval to conduct business in Louisiana.  Brown would meet with businessmen and offer to use his influence with the governor to obtain favorable treatment for their business ventures.  The illegal payoffs, which Brown and Edwards would split, typically were disguised as consulting fees paid to Brown's company, Louisiana Consultants.

The indictment focused on four commercial ventures: the Coushatta Indian Tribe's request to operate a casino, a bid on a municipal waste contract, an unsuccessful attempt to bring a professional basketball team to New Orleans, and a plan for a privately funded and operated juvenile detention facility in Jena, Louisiana.  The Jena prison project involved a Texas company, Viewpoint Development Corporation, whose president was Fred Hofheinz, the former mayor of Houston, Texas.[1]  Viewpoint's principal negotiator with Louisiana officials was Patrick Graham,

---

[1]    Hofheinz pled guilty in November 2000 to misprision of extortion and was a witness for the Government at Cecil Brown's trial.

who began cooperating with the FBI after he was indicted on unrelated criminal charges in early 1996.

The jury convicted Cecil Brown on seven counts of extortion, wire fraud, and interstate travel fraud, in violation of 18 U.S.C. §§ 1962, 1951, 1343, and 2314. Brown was acquitted, though, on one count of racketeering and one count of interstate travel fraud. He was sentenced to 51 months' imprisonment, to be served consecutively to the 66-month sentence imposed in a related extortion case involving riverboat casino licenses. See United States v. Edwin Edwards, et al., No. CR-98-165-B-M2 (M.D. La.).

Cecil Brown raises two issues on appeal. First, Brown contends that the Government's case against him rests on an unlawfully obtained wiretap application. He contends that the Assistant United States Attorney who requested the initial wiretap order misled the district court as to (1) the trustworthiness of Patrick Graham, the Government's cooperating witness, and (2) the content of consensually-taped conversations between Graham and Brown. Brown thus asserts that the evidence obtained via the wiretap should have been suppressed and, at a minimum, he was entitled to an evidentiary hearing on his motion to suppress evidence.

Second, Brown contends that the Government vindictively added the racketeering count and additional allegations of illegal conduct after the district court granted Brown's motion to dismiss the original indictment because of a Speedy Trial Act violation.

3

Brown argues that the Government's decision to increase the number and severity of charges denied him due process of law and, consequently, that the superseding indictment should have been dismissed.

The district court considered Brown's arguments and denied his motions to suppress the evidence obtained from the wiretap and to dismiss the superseding indictment. Finding no error, we affirm the judgment.

## II. THE WIRETAP ORDER

### A. The Franks Standard

Cecil Brown contends that the FBI agent's affidavit supporting the Government's application for a wiretap order was insufficient to establish probable cause. According to Brown, the affidavit contained "a series of misrepresentations and material omissions" designed to give a false impression of both the reliability of the Government's confidential informant and the quantum of evidence the Government already had gathered. Brown argues that the district court erred in denying his request for an evidentiary hearing pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and also in failing to suppress the evidence gathered through electronic surveillance.

With respect to Franks hearings, we have held that a defendant is entitled to an evidentiary hearing on a motion to suppress evidence if he shows that (1) allegations in a supporting

4

affidavit were deliberate falsehoods or made with a reckless disregard for the truth, and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause. United States v. Dickey, 102 F.3d 157, 161-62 (5th Cir. 1996)(citing Franks, 438 U.S. at 171, 98 S.Ct. at 2684); see also United States v. Guerra-Marez, 928 F.2d 665, 671 (5th Cir. 1991). The second prong of the test, however, is often determinative: "Even if the defendant makes a showing of deliberate falsity or reckless disregard for the truth by law enforcement officers, he is not entitled to a hearing if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." Dickey 102 F.3d at 161-62; United States v. Privette, 947 F.2d 1259, 1261 (5th Cir. 1991).

The district court concluded that Brown was not entitled to a Franks hearing and denied Brown's motion to suppress evidence gathered through electronic surveillance. The wiretap order at issue here led to three separate prosecutions, and the defendants in each case raised nearly identical motions to suppress. District Judge Frank Polozola set out at length his reasons for denying the motion in the riverboat license extortion case, in which Cecil Brown was a codefendant. See United States v. Edwin Edwards, et al., 124 F.Supp.2d 387, 393-400 (M.D. La. 2000). Then, in a case involving criminal tax violations by an Edwards associate, District Judge Carl Barbier independently reviewed the record and adopted

5

Judge Polozola's findings when denying Martin's motion to suppress. See United States v. Andrew Martin, 169 F.Supp.2d 558, 566-67 (E.D. La. 2001)(criminal tax violations). And in this case, then-District Judge Edith Brown Clement reviewed the materials and adopted Judge Polozola's findings as her own.

This court reviews the denial of a Franks hearing de novo. Dickey, 102 F.3d at 62.

Brown's allegations of false or misleading statements may be grouped under two headings. First, he says that the Government relied heavily on a cooperating witness, Patrick Graham, whom the Government knew was completely untrustworthy. Second, Brown contends that the Government misrepresented what was actually said during consensually recorded conversations between Graham and Brown.

### B. Patrick Graham's Reliability

The Government's application for a wiretap order was supported by the affidavit of FBI agent Freddy Cleveland. Agent Cleveland stated that the facts and circumstances showing probable cause were developed through a "cooperating witness" (or "CW"), who was later identified as Patrick Graham. In his affidavit, which was dated June 26, 1996, Agent Cleveland began his discussion with the following statement:

> The CW has provided information to Special Agents of the FBI since April 30, 1996. Since his cooperation with the FBI, he has never been known to provide false or misleading information. The CW has made numerous consensual telephone and body recordings with CECIL

6

BROWN, which have verified portions of the information set forth in this affidavit. A review of the various records pertaining to the CW reveals that on March 20, 1996, a District Court Grand Jury in Harris County, Texas indicted the CW for one (1) count of Money Laundering and one (1) count of Theft by Sting. This matter is pending and is scheduled for trial on July 29, 1996. The CW is also the target of a federal tax and corruption investigation in the Houston, Texas area, currently being handled by the FBI and the IRS in conjunction with the United States Attorney's Office.

In spite of the agent's disclosure of the pending criminal charges and investigation, and the Government's corroboration of much of what Graham had told them, Brown contends that the Government deliberately misled the district judge (Judge Donald Walter) as to Patrick Graham's trustworthiness.

Brown argues that the Government did not believe that Graham was even minimally trustworthy. Brown's primary argument on this point is based on a statement made in different court proceedings by the same Assistant U.S. Attorney who had applied for the wiretap order. In a bankruptcy proceeding in Texas in September 1996 -- which involved Patrick Graham's brother's wife -- the AUSA told the court that "the Grahams" are not credible: "[T]he things that we're not able to independently corroborate, we believe are lies. And that's the way it has to be when you deal with the Grahams." As Brown admits, the AUSA made this statement nearly three months after he had obtained the wiretap order. Even if we assume that the later statement accurately reflects the Government's view of Patrick Graham's credibility as of June 1996, we do not believe that Agent Cleveland's affidavit falsely implied

7

that Patrick Graham was trustworthy. As noted above, the affidavit recites the various charges brought against Graham (although Brown complains that the "sterile recitation" of pending charges did not adequately reveal the extent of Graham's criminal nature). And immediately after stating that Graham had not been known to provide false or misleading information, Agent Cleveland emphasized that the FBI had made "numerous consensual telephone and body recordings" that corroborated significant aspects of Graham's story.

In sum, the affidavit provided to Judge Walter contains enough information with respect to Graham's reliability for the judge to make a proper ruling on the question of probable cause. Brown has failed to show that the allegations in Agent Cleveland's supporting affidavit were made "with a reckless disregard for the truth" and for the purpose of bolstering Patrick Graham's credibility. Brown thus does not meet the standard set forth in the first prong of the Franks test.

Moreover, even if we assume *arguendo* that Patrick Graham could not be trusted, and we set to one side all the allegations that are not independently corroborated, the affidavit still contains enough evidence to establish probable cause to believe that a crime was being committed.

Patrick Graham's narrative, reduced to its essentials, may be summarized as follows: In mid-1992, Graham and several of

8

his business partners began lobbying for the right to develop a juvenile detention center in Jena, Louisiana. To secure political support for the project, Graham arranged a meeting with Cecil Brown, a friend of Governor Edwards. After several false starts, Graham thought he had obtained financing for the Jena project. Graham asserted that Governor Edwards agreed to pressure Richard Stalder, the director of the Louisiana Department of Corrections, to enter into a "cooperative endeavor agreement" with Graham. In return, Graham agreed to pay Edwards and Brown $2.5 million. Graham claims that he made a $245,000 cash payment in 1994. Then, Graham and Brown (in FBI Agent Cleveland's words) signed "a contract for services, dated December 1, 1994, to account for [$600,000 in cash] given to BROWN. A copy of the contract has been provided to FBI agents by the CW." FBI agents also obtained a copy of the agreements between Graham and the Louisiana Department of Corrections. The date when the state officials approved the project corresponds to Graham's account of when Edwards was lobbying on his behalf.

In late 1995, Graham and his partners agreed to sell their interest in the Jena prison project to a Houston attorney (Douglas Bech) for $4.8 million, including $1.3 million owed to unnamed "creditors". Graham asserts that the $1.3 million represented the remainder of the money owed to Brown and Edwards. Graham expected that the sale would be finalized in the summer of

9

1996. FBI agents obtained a copy of Viewpoint Development's contract with Bech and confirmed the numbers Graham had given them.

By early 1996, Graham had been indicted for two criminal offenses and was under investigation by the FBI. Graham began cooperating with the FBI on April 30, 1996, and with Graham's consent, the FBI began taping telephone and in-person conversations between Graham and Brown.

During the May 8th conversation, Brown and Graham talked about the remaining money that Graham's partners owed. Graham and Brown tried to negotiate the exact amount. Graham said, "Now what I have given you all so far totals up to by the time you figure the tax, you know, it was cash. By the time you figure the tax, it's like a million dollars. So you offset. That leaves a balance of 1.5." Brown responded, "All right." A little later in that conversation, Brown said that unless he received $1.7 million during the closing, they would have "problems." The parties failed to reach a definite agreement, but Brown suggested that Graham "put to paper everything that was paid to date."

From May 9 to May 13, 1996, FBI agents recorded (again with Graham's consent) three telephone conversations, the essence of which was that Graham and Brown would meet in person to "go over the figures." On May 29, Graham and Brown met at a crawfish boil at Brown's house. At the FBI's direction, Graham prepared a memo regarding the two payments -- $245,000 and $600,000 in cash -- already made to Brown. The FBI also recorded the conversation,

10

which included references to the memo.  Brown suggested that he would talk to "our friend" (whom the Government believes was Edwin Edwards), and a court-authorized "pen register" revealed a telephone call from Brown's residence to Edwards's residence on May 30th.

On June 7, FBI agents again recorded a telephone conversation between Brown and Graham.  Brown said that he had discussed the specific numbers with their "friend" the day after the crawfish boil.  Brown then demanded more money and suggested that the Department of Corrections might hold up the Jena project.  Graham and Brown agreed to meet again.  At this point, the Government prepared to request a wiretap for the telephones in Brown's house and business.

Having reviewed the information contained in the affidavit, we will focus on the allegations that are either undisputed or corroborated.  It is undisputed that Graham and his partners were seeking state approval to proceed with the Jena prison project.  The memorandum that Graham prepared and Brown tacitly approved indicated that Graham had already made two payments totaling $845,000 to Cecil Brown in December 1994.  (Graham and Brown later suggested that these cash payments were equivalent to more than $1 million before taxes.)  Shortly after the $600,000 payment was made, state officials entered into a cooperative endeavor agreement with Graham and his partners.  More than a year later, when Venture Development was selling its

11

interest in the project, the purchase price included a $1.3 million payment for unnamed creditors. On the recorded conversations, Graham and Brown emphasized that they wanted to keep "Edwin" or "our friend" happy because he still had the ability to put the project on hold. Graham and Brown also discussed the money that had been paid thus far and how much more was owed. Brown told Graham that he had to consult with "him," and a pen register indicated that a call was placed from Brown's residence to Edwards's residence the following day. Brown then suggested that the Jena project would be in trouble if Graham and his partners could not pay more money.

To be sure, there are many allegations in the affidavit that are not independently confirmed. Graham told the FBI that he had met with Edwin Edwards several times personally, that Edwards had set the $2.5 million price, and that he saw Brown leave the $245,000 and $600,000 cash payments in Edwards's office in the Governor's Mansion. These allegations are reported in FBI Agent Cleveland's affidavit, but they are not corroborated. Even if we assume that Graham cannot be believed, and we exclude all allegations that are not corroborated, the affidavit still contains sufficient information to establish probable cause to believe that a crime had been committed or was being committed. In our view,

12

the recorded conversations independently corroborate the salient aspects of Patrick Graham's story.[2]

### C.  The Recorded Conversations

In a similar vein, Brown contends that FBI Agent Cleveland's interpretation of the taped conversations was made with reckless disregard for the truth.  Specifically, Brown argues that the Government assumed that Graham and Brown were referring to Edwin Edwards even when they did not call him by name.  Brown contends that the Government used "very selective excerpts" from the recorded conversations to suggest that Edwards (and not Brown) was receiving most of the money.  Thus, in Brown's view, if the Government had provided an accurate rendition of the recorded conversations (that is, one that did not rely on Graham's background information), a district judge likely would have interpreted the recorded conversations as a discussion of a legitimate consulting arrangement instead of a scheme to extort money.  Brown's argument is without merit.

The best way to address this issue is to recount in greater detail the recorded conversations.  The first conversation takes place on May 8, 1996, as Patrick Graham and Cecil Brown are

---

[2] Brown also asserts, with little elaboration, that the district court could not adequately assess Patrick Graham's reliability because the Government failed to disclose "the many benefits" Graham would receive from his cooperation. The Government had agreed, for example, not to use any of the volunteered information against Graham and to inform the sentencing judges in the other cases about Graham's assistance.  Brown's argument is without merit.  Not only are these benefits unremarkable, but the consensually recorded conversations corroborated Graham's story.

13

driving through Louisiana. Brown says that he needs money and wants assurances that he will receive half of the agreed-upon price ($2.5 million plus another $1 million for a related deal) when Graham and his partners sell their interest in the Jena prison project. Graham tries to assure Brown that the deal will be closed soon. Graham then emphasizes "one thing":

PG: I want EDWIN to be comfortable, okay? I can't afford anything to go wrong on this deal. All right? So, we've got to get him, whatever that portion is covered first. . . . I'm not gonna drag you out more than 90 days on yours. Okay?

CB: Yeah.

PG: I just don't . . . ah, you know, you never have told me what the . . . the . . . the sharing ratio is.

CB: He doesn't get any. I get it all. I want half right away.

PG: Okay. Hey, say whatever you want to . . . .

CB: Uh huh.

PG: . . . but I mean [don't?] be cavalier about this CECIL.

CB: Okay.

PG: But if . . .

CB: Nothing's gonna go wrong with this deal. I just want half of my money right away to cover some obligations I have.

PG: I understand. I understand.

CB: Okay.

PG: And I need to get your obligations. I need to be assured. . . .

CB: And then I want. . . .

PG: . . . that your obligations are covered.

CB: Right.

PG: That's what I want.

CB: And then I want a little bit. . . . I want a little bit of my other half. . .

PG: I understand.

CB: . . . also at closing. And I'm not talking about much there.

Before proceeding further, we should emphasize that (as Brown correctly points out) Agent Cleveland's affidavit omitted Brown's

14

statement that Edwards "doesn't get any" of the money.  It would have been preferable, of course, to bring this fact to Judge Walter's attention.   However, we agree with Judge Polozola's conclusion that Brown's denial of Edwin Edwards's "'take' of the proceeds of this transaction in one particular excerpt does not negate the additional information in the record regarding potential criminal payoffs." Edwards, 124 F.Supp.2d at 400.  In fact, the context of this excerpt suggests that Brown's denial cannot be taken at face value: After stating that he gets "all" the money, Brown immediately says that all of the first payment will go to cover "obligations."  Graham, who had just said he wanted to be sure that Edwin Edwards got his portion, then rephrased his concern: "I need to be assured . . . that your obligations are covered."  The more plausible reading of this particular passage is that Edwards would be receiving -- through Cecil Brown -- most, if not all, of the initial payment of $1.7 million.   This interpretation is made even stronger by remarks made later in that same conversation.

Brown and Graham then make their first attempt to clarify how much money was owed.  Brown tells Graham that eventually they need to "put a pencil to paper."  Patrick Graham's position was that the total money owed was $3.5 million; that he had already paid the equivalent of $1 million to $1.2 million in cash; that $1.7 million would be paid to Brown when the deal in Texas went through; and that Graham's partners in Texas wanted him to re-

15

negotiate the remaining money owed. Brown's primary concern, however, was getting the $1.7 million as soon as possible.

> PG: I know you're always broke and I need to know your . . . your share . . . but what I need to know is what is it that we have to come [up] with to satisfy our friend to make sure that . . . the worst that can happen CECIL, is a project go bad even after you get funded and everybody gets . . . we can't be cavalier and say . . .
> CB: Unh-unh. Unh-unh.
> PG: This is great. He's out of office. There's . . . there's no risk anymore. I'm telling you. . . .
> CB: If . . . if I don't get 1.7 at closing . . . if . . . if my company, LOUISIANA CONSULTANTS, doesn't get 1.7 at closing. . .
> PG: Um hum.
> CB: . . . ah
> PG: Then we've got a problem.
> CB: We've got problems, okay.

There can be little doubt that "our friend" in this context means Edwin Edwards. Not only was Edwards the sole topic of conversation up that point, but the reference to being "out of office" reinforces the point: Edwards's term as governor had ended in January 1996, four months before this conversation. Patrick Graham repeated this point moments later: "I know he's out of office now [. . .], but we don't want anything to go wrong."

In addition to the unmistakable references to Edwards, this passage is also important because it confirms that the $1.7 million would be paid to Louisiana Consultants. As noted above, Cecil Brown was doing business as Louisiana Consultants, so that any payment to the company was essentially a payment to Brown personally.

16

The conversation then returns to Brown's need for money at closing. Brown says, "if I were you,"

> CB: I would be prepared at closing to pay me 1.7, and . . . and I . . . and I need a few dollars. I need a . . .
> PG: Okay. So what you're saying is, the 1.7 is not gonna satisfy you. We need something over that to get you happy.
> CB: Please.

Graham warns Brown not to take any of the $1.7 million payment for his own use. According to Graham, the other partners in Viewpoint Development needed to be reassured that the payment at closing would not go directly to Brown. In the end, Graham agrees to deliver some money in addition to the $1.7 million at closing on one condition:

> PG: [. . .] as long as we can make the agreement CECIL that you're not gonna take from his ah, and create a problem for this thing. I will . . . I will go back and tell my partners that, okay, we need to come up with half of it to cover ah, all our obligations so that ah, ah . . . let me tell you. He's got the ultimate hammer. CECIL, he's got the ultimate hammer. All he's got to do is make phone calls and stop the legislature . . .
> CB: Huh. Huh.
> PG: . . . from funding this thing, and that's Texas all over. That's the problems I had in Texas. You don't need it and I don't need it. I mean, you'll have everybody investigating everything. (Pause)
> CB: I need 1.7 at closing for LOUISIANA CONSULTANTS. And can you let me have ah . . .
> PG: What?
> CB: A couple of hundred thousand?
> PG: Okay.

It is clear that the $1.7 million is earmarked for someone other than Cecil Brown and that this unnamed person has the power to squelch the Jena prison project by pressuring state legislators.

17

Just a few seconds later, Brown confirms his understanding of the new arrangement.

```
CB:   The 1.7 I believe, we . . . we do that at closing.
      That's cut and dry.  Am I correct?
PG:   Okay.  And . . . and that you can't touch.  That's
      not yours.  That goes to obligations.  We've got to
      come up with another hundred thousand to . . . to
      make . . . that you can keep to take care of what
      you get.
CB:   [. . .] Hell yeah.  I can do that.
```

Patrick Graham again warns Brown not to keep the $1.7 million. Graham then says that his partners are afraid that Brown will keep some of the money. But, Graham tells Brown, "you and I know different. Ah, ah, you know, we talked about it before. I think the bastard rapes and pillages you, but that's, you know, that's your relationship. I don't get into it."

Brown became rather angry at this point. Raising his voice, he says

```
CB:   [. . .] At closing make sure that I have ah, 1.7
      paid to LOUISIANA CONSULTANTS plus a hundred
      thousand dollars to get me out of a crack.
PG:   Okay.
CB:   And then after that every 30 days ah, it . . . it
      don't have to be a hundred thousand dollars every
      30 days.  I just want to make sure that I get my
      money.
PG:   Please assure me CECIL that you're not gonna step
      on that and keep it.  It just concerns the shit out
      of me.
CB:   Don't let it.  I know what I'm doing.  You think I
      would . . . I would take a chance at queering this
      deal where it is now?  How long have we waited?
      How long have we worked?
PG:   Now CECIL, I'm telling you.  I'm . . . I'm telling
      you.  I just want him happy.  Okay?  I want your
      assurance that you'll do what it takes to get him
      happy.  Okay?
```

18

After a short pause, Graham asked Brown if he had briefed "him" on the status of the project. Brown replies that "he" knows about the details, and Graham immediately changes the subject and asks if "he" had fun in Colorado. The two men then talk briefly about Governor and Mrs. Edwards's recent ski trip to Colorado.

Graham then returned to the topic of how much money had already been paid. Graham reminded Brown that he had already delivered "two large bundles of . . . of green money." The "before tax equivalent" of the cash payments, Graham explained, was anywhere from $1 million to $1.2 million, "depending on how you do your tax math." When the $1.7 million due at closing was factored in, that left a balance of $600,000 to $800,000. Brown and Graham quibbled for a while over how much had been paid and how to calculate the balance. Graham demanded, "Give me credit for what I've already paid." Brown said he wanted to know the exact balance: "That's the number I need to know."

```
CB:  Because I want to know what I'm getting.
PG:  I understand, because that remains with you.  I am
     appreciative of that and I'm sensitive to it.
CB:  And if you need some of that . . .
PG:  I want you . . .
CB:  . . . some of that that's coming to me, that's
     fine, because you got me here in the first place.
PG:  No. No.
CB:  But do not flirt with that other motherf***er.  Do
     not.
```

Brown reiterated that he needed to know "the second number" (i.e., the $600,000 to $800,000 balance) soon, and that he did not want to negotiate that number downward.

19

Graham then told Brown to "let me know how your discussions go tomorrow." It is not obvious who Brown was scheduled to meet with, but Graham warned Brown, "Don't piss him off." Brown called Graham back on May 9th to say that he "had a discussion with him . . . . [and] got some directions what I need to do. . . . I'm directin' to get ah all of my money." The two men agreed to sit down and talk more about the balance owed.

At a May 29th crawfish boil, Graham wrote on a sheet of notebook paper what he and his partners were proposing. Graham calculated that they had already paid in cash the equivalent of $1.2 million. Graham wrote that they would pay the "1.7 due at closing, plus $100,000." Because a side deal had fallen through, Graham and his partners were not willing to pay the full $3.5 million they had previously agreed upon. Brown was not pleased with this offer, but Graham insisted that he "sit down with the man and go over it and I want you to come back and tell me, PAT, that's okay, or no, we gotta negotiate some more."

About a week later, Graham called Brown and said, "I know you didn't have time to uh, uh, to discuss anything with our friend about those numbers." Brown said that he had spoken to him "the very next day" after the crawfish boil. (As noted above, a court-ordered pen register indicated that a call had been placed from Brown's residence to Edwards's residence the evening after the party.) Brown accused Graham of "trying to pay me a hundred thousand when I feel you owe me a million."

Graham said that he understood that Brown was not happy about receiving only $100,000, but he emphasized,

```
PG:  I just want uh, uh, certain parties, we need our
     friend to be happy on the front side, that's all,
     um, my goal is.  I could make you happy.
CB:  I'm sure he's happy.
PG:  Okay.
CB:  You know he ought to be.
PG:  I understand.  (Laughter)
CB:  I'm not happy.
```

Brown said that he had "ask[ed] him to do something about it."

```
CB:  Have you not gotten a call yet?
PG:  No.
CB:  Okay, you will.
PG:  Alright, is he gonna call me?
CB:  No, uh, probably Stalder [the secretary of the
     Louisiana Department of Corrections].
```

There is no indication whether Graham received a telephone call, but the import of this threat is clear: The Louisiana Department of Corrections could delay the Jena prison project; and if Graham and his partners wanted their sale to proceed as planned, they should consider increasing the money paid directly to Brown.

In their final conversation before the Government's decision to seek a wiretap order, Brown and Graham again failed to reach an agreement.  Graham says, "We're gonna make him happy.  Okay?"  Brown counters that "He, ah my lawyer says I'm stupid" for trusting Graham and his partners.  Graham became angry:

```
PG:  I wish you'd throw right back at that son of a
     bitch that he's gone to the bank hundreds of
     thousands of [. . .] dollars on me.
CB:  I'm worried about Cecil.  I ain't worried about
     him.
PG:  Okay.
```

21

```
CB:   Oh, he's gone to the bank a million times[. . . .]
      But that don't help me.
```

Graham tries to assure Brown that they can work something out to get him more money up front. But in the end, Graham returns to his main theme:

```
PG:   [A]ll I want is I don't want it to blow up and all
      I want to do is keep him happy because you and I we
      can get him happy, then you and I can make some
      money in the long run.  Okay?
CB:   Have you, ah, ah, my lawyer has met with ah I'm
      surprised you didn't get a call yet.  But maybe you
      will or maybe he tried and maybe they talked again.
```

Graham ended this conversation, as he often did, by telling Brown not to worry and to trust him.

Having reviewed these recorded conversations, we conclude that the Government reasonably believed that the $1.7 million paid by Viewpoint Development was going to Edwin Edwards and that Edwards (at Brown's request) was willing to use his influence to increase the share paid directly to Brown. In other words, when FBI Agent Cleveland deduced that "our friend" and "him" referred to Edwin Edwards, those allegations were not made with reckless disregard for the truth. We agree with the three district judges who have considered this issue before and hold that the allegations in the affidavit, which accurately summarized the recorded conversations, support a finding of probable cause. Therefore, Cecil Brown was not entitled to a <u>Franks</u> hearing on his motion to suppress the evidence.

### III.  VINDICTIVE PROSECUTION

22

The second issue on appeal is whether the district court erred in not dismissing the superseding indictment on the grounds that the Government was engaged in a vindictive prosecution in violation of the Fifth Amendment's Due Process Clause. As noted above, Brown contends that the Government vindictively added a racketeering count and an additional allegation of illegal conduct after the district court granted Brown's motion to dismiss the original indictment because of a Speedy Trial Act violation.

Addressing this issue requires a more detailed review of the procedural history of the case. A grand jury for the Middle District of Louisiana returned the original indictment against Cecil Brown in November 1999. A year later, for reasons not germane to this appeal, the Fifth Circuit reassigned the case to the Eastern District of Louisiana. The district court, with the approval of both parties, continued the trial until February 2001 in order to allow defense counsel additional time for preparation.

In December 2000, Cecil Brown moved to dismiss the original indictment, citing violations of the Speedy Trial Act. The district court conducted a conference by telephone on December 20, 2000. According to Brown's attorney, the Assistant U.S. Attorney threatened that if Brown prevailed on the Speedy Trial Act motion, the government would seek a new indictment.

In January 2001, the district court granted Brown's motion to dismiss the original indictment. United States v. Brown, 2001 WL 13337 (E.D. La.). As he had indicated before, the AUSA

23

quickly obtained a new indictment that included allegations of extortion involving the Coushatta Indian Tribe as well as a new count for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) and a notice of forfeiture under RICO.

Shortly before the case went to trial in March 2001, Cecil Brown moved to dismiss the superseding indictment on the grounds that the Government's decision to bring additional charges amounted to prosecutorial vindictiveness in violation of Brown's rights guaranteed by the Due Process Clause of the Fifth Amendment. See Blackledge v. Perry, 417 U.S. 21, 25-27, 94 S.Ct. 2098, 2101-02, 40 L.Ed.2d 628 (1974). The district court denied Brown's motion to dismiss the superseding indictment.

We review the district court's factual findings concerning prosecutorial vindictiveness for clear error and its legal determinations de novo. United States v. Johnson, 91 F.3d 695, 698 (5th Cir. 1996).

"If the defendant challenges as vindictive a prosecutorial decision to increase the number or severity of charges following a successful appeal, the court must examine the prosecutor's actions in the context of the entire proceedings." United States v. Krezdorn, 718 F.2d 1360, 1364 (5th Cir. 1983) (en banc). And, as Judge DeMoss succinctly put it, "if there is any indication that the prosecutor had a legitimate reason . . . for increasing the charges, then no presumption of vindictiveness is

24

created." United States v. Aggarwal, 17 F.3d 737, 744 (5th Cir. 1994)(citing Krezdorn, 718 F.2d at 1364).

The context of the entire proceedings includes the timing of the prosecutor's decision. Johnson, 91 F.3d at 698. While the general standard articulated in Krezdorn makes no distinction between pre-trial and post-trial decisions, the Supreme Court has observed that "a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision." United States v. Goodwin, 457 U.S. 368, 381-82, 102 S.Ct. 2485, 2492-93, 73 L.Ed.2d 74 (1982). Many of our cases, including Krezdorn, have involved new indictments following a successful appeal by defendants. The reason is apparent: By the time a case has been tried, the Government has discovered and assessed all the relevant information and has reached a decision about the extent to which the defendant should be prosecuted. A pre-trial change in the indictment (e.g., following the rejection of a plea agreement) is less likely to be deemed vindictive: "In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance." Goodwin, 457 U.S. at 381-82, 102 S.Ct. at 2492-93.

Krezdorn suggests that we employ a burden-shifting framework for evaluating prosecutorial vindictiveness claims. "Absent a presumption of vindictiveness . . . , the defendant must

25

prove that the prosecutor's conduct was actually vindictive." Johnson, 91 F.3d at 698.

Applying these principles, the district court found no indication that the prosecutor was acting vindictively.

First, as the district court pointed out, one should not read too much into the fact that 13 months passed between the time of the original indictment and the time when the RICO charge and Coushatta allegations were added. The court found that the Government originally indicted Cecil Brown to avoid potential problems with the statute of limitations and that the Government allowed the case to lie dormant until it had first tried the related cases involving Governor Edwards and Insurance Commissioner Jim Brown. When viewed in the light of these facts, "the apparent dilatoriness in the change of the original charge evaporates." The fact that the indictment could have been amended earlier to include a RICO count and allegations of fraud involving the Coushatta Indian Tribe's casino deal is not probative.

Second, the district court found that the Government had already decided to seek a new indictment before Brown moved to dismiss on Speedy Trial Act grounds. The AUSA filed a statement explaining why he thought there was a potential defect in the travel fraud counts in the original indictment. Moreover, the Government wanted to seek a forfeiture and to bring in evidence of the Coushatta Tribe casino deal. The Government believed that the RICO count would address these problems, and the district court

26

accepted this explanation as true. The prosecutor's explanation is further supported by the fact that the Government had filed a motion to admit (under Fed. R. Evid. 404(b)) evidence of the allegations involving the Coushatta Tribe before Brown filed his motion to dismiss for Speedy Trial Act violations.

Third, the district court reasoned that Brown's assertion of his rights under the Speedy Trial Act was not consequential enough to provoke a vindictive response. The district court informed the parties that, if she found a violation of the Speedy Trial Act, she would dismiss the indictment without prejudice because of the unusual circumstances of the case. As the dismissal was without prejudice, and the prosecutors could not have been inconvenienced by Brown's motion (which was pending for less than a month), the district court thought it "extremely unlikely that the prosecutor would feel the need to 'punish a pesky defendant for exercising his legal rights'" (citing Goodwin, 457 U.S. at 384, 102 S.Ct. at 2494).

Finally, the district court rejected Brown's argument that the AUSA's statements during the telephone conference constitute direct proof of actual vindictiveness. During this conference, the AUSA indicated that he would seek additional charges if the motion to dismiss the original indictment were granted. And, of course, when the original indictment was dismissed, the Government carried through on its promise. However, in her order denying the motion to dismiss, the district court

27

emphasized that she was on the line during the discussions and that "the Court did not perceive the prosecutor's statements as a threat." The district court found that "the prosecutor was merely giving Brown fair warning that, if forced to reindict, he would cure perceived deficiencies in the original indictment that he might not have been allowed to correct had trial proceeded as scheduled."

Brown has failed to show why the district court's factual findings in this matter are clearly erroneous. Brown insists that the AUSA explicitly tied his decision to seek a harsher indictment to Brown's assertion of his rights under the Speedy Trial Act. Also, Brown argues that the AUSA knew about the Coushatta transactions as early as July 1996, and there was no reason for not including them in the indictment. Even if we accept Brown's assertion on this point, it is not disputed that the Government had planned to introduce the Coushatta allegations at trial and that the Government had filed a Rule 404(b) motion before Brown filed his motion to dismiss.

In sum, the district court did not err in concluding that no presumption of vindictiveness arises in this case. The Government's decision to add the new charges and allegations was motivated a non-vindictive purpose, namely, to strengthen the Government's case.

## IV.  CONCLUSION

28

For the foregoing reasons, the judgment is **AFFIRMED.**

KING, Chief Judge, specially concurring:

With one small exception, I concur fully in Judge Jones's excellent opinion for the panel. The exception relates to whether the Government effectively misrepresented Patrick Graham's credibility to the district judge when the agent said, in his affidavit, that "[s]ince his cooperation with the FBI, he has never been known to provide false or misleading information." The agent provided information (about pending indictments and a pending federal tax and corruption investigation of Graham) to the district judge that would put the judge on notice that Graham was potentially untrustworthy. Nevertheless, on the basis of Brown's offer of proof, the district judge may not have been fully advised (as he should have been) of what may have been the Government's well-founded conviction that Graham was, in fact, untrustworthy. But, as Judge Jones has clearly established, even if we assume arguendo that the Government was not truthful or sufficiently forthcoming on the matter of Graham's lack of trustworthiness and we set aside all the allegations that are not independently corroborated, the affidavit still contains enough evidence to establish probable cause to believe that a crime was being committed.

DENNIS, Circuit Judge, concurring in the judgment and in Parts I, III, and IV of the court's opinion, and specially concurring in Part II:

In my judgment, Brown satisfied the first prong of the *Franks v. Delaware*[3] test by showing that information was omitted from the warrant affidavit with intentional or reckless disregard for the truth.  I concur in the judgment of the court, however.  When the material that was intentionally or recklessly omitted is added, and Patrick Graham's uncorroborated statements are set aside, there remains sufficient content in the reconstructed affidavit to support a finding of probable cause for belief that Brown had committed, was committing, or was about to commit violations of the Hobbs Act.  Consequently, Brown was not entitled to a *Franks* hearing.

In *Franks*, the Supreme Court held "that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of

_____

[3]438 U.S. 154 (1978).

-31-

probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."[4] In summarizing its opinion, the Court repeated its holding with "some embellishment":

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there

---

[4]*Id.* at 155–56.

remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.[5]

In this circuit, "[o]missions or misrepresentations can constitute improper government behavior."[6] "By reporting less than the total story, an affiant can manipulate the inferences a magistrate will draw. To allow a magistrate to be misled in such a manner could denude the probable cause requirement of all real meaning."[7] We therefore apply *Franks* to instances of omission.[8] To warrant a *Franks* hearing, the exclusion of the information must reflect intentional or reckless misconduct by the affiant, and the omitted facts must be material.[9] "Clear proof of deliberate or

---

[5]*Id.* at 171–72.

[6]*United States v. Tomblin*, 46 F.3d 1369, 1377 (5th Cir. 1995) (*citing United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985)).

[7]*Stanert*, 762 F.2d at 781.

[8]*United States v. Bankston*, 182 F.3d 296, 305 (5th Cir. 1999), *rev'd in part on other grounds*, *Cleveland v. United States*, 531 U.S. 12 (2000).

[9]*See Tomblin*, 46 F.3d at 1377.

-33-

reckless omission is not required. . . .  At this stage, all that is required is that the defendant make a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading."[10]

Furthermore, we have agreed with and adopted the holding of several other circuits "that a deliberate or reckless misstatement or omission by a governmental official who is not the affiant may nevertheless form the basis of a *Franks* claim."[11]  Indeed, the Supreme Court noted in *Franks* that "police [can]not insulate one officer's deliberate misstatements merely by relaying it through an officer-affiant personally ignorant of its falsity."[12] Accordingly, a defendant is entitled to a *Franks* hearing upon making a substantial preliminary showing that a governmental official deliberately or recklessly caused facts that preclude a finding of

---

[10]*Stanert*, 762 F.2d at 781.  *See Franks*, 438 U.S. at 171.

[11]*Hart v. O'Brien*, 127 F.3d 424, 448 (5th Cir. 1997) (*citing United States v. Wapnick,* 60 F.3d 948, 956 (2d Cir. 1995); *United States v. DeLeon,* 979 F.2d 761, 764 (9th Cir. 1992) ("A deliberate or reckless omission by a government official who is not the affiant can be the basis for a *Franks* suppression.  The Fourth Amendment places restrictions and qualifications on the actions of the government generally, not merely on affiants."); *United States v. Calisto,* 838 F.2d 711, 714 (3d Cir. 1988); *United States v. Pritchard,* 745 F.2d 1112, 1118 (7th Cir. 1984)), *abrogated on other grounds by Kalina v. Fletcher*, 522 U.S. 118 (1997).

[12]*Franks*, 438 U.S. at 164 n.6.

probable cause to be omitted from a warrant affidavit, even if the governmental official at fault is not the affiant.

In challenging the presumption of validity afforded the affidavit supporting the wiretap order, Brown alleged, in his motion to suppress, that the affidavit of FBI Special Agent Freddy N. Cleveland was "materially misleading." In particular, Brown contended that the government intentionally misled Judge Walter as to the trustworthiness of its cooperating witness, Patrick Graham, and misrepresented the content of the consensually recorded conversations between Graham and Brown. In support of those allegations, Brown submitted to the district court an offer of proof consisting of ten volumes of exhibits. The exhibits included: (1) a transcript of testimony given by former Assistant United States Attorney ("AUSA") Steven J. Irwin before a federal bankruptcy court in Houston, Texas, on September 16, 1996;[13] (2) transcripts of deposition testimony given by Irwin and James B. Letten in November 2000;[14] (3) various news articles recounting

---

[13]Irwin appeared before the bankruptcy court in support of the government's *ex parte* motion to stay proceedings in a case that involved Michael Graham's wife. Michael Graham, who reached a deal with the government at the same time as his brother Patrick, was scheduled to testify in that case. In requesting the stay, the government apparently argued that the bankruptcy proceedings (and Michael Graham's testimony therein) could jeopardize its undercover operations in Louisiana.

[14]Letten, who was the First Assistant United States Attorney at the time of his deposition, is currently the Acting United States Attorney for the Eastern District of Louisiana. Letten and Irwin were deposed on different dates in November 2000 by a

Graham's criminal history; and (4) the full transcripts of the consensually recorded conversations.

In his June 26, 1996 affidavit, Cleveland indicated that his cooperating witness was credible: "[Patrick Graham] has provided information to Special Agents of the FBI since April 30, 1996. Since his cooperation with the FBI, he has never been known to provide false or misleading information."[15] Brown's offer of proof demonstrates, however, that the government knew, as early as April 1996, that Graham was thoroughly dishonest and had a reputation in Texas for engaging in fraudulent and deceptive practices. The offer of proof also indicates that the affidavit purposefully understated the seriousness of the criminal matters that were pending against Graham in Texas and the magnitude of Graham's incentive to provide false information about Brown and Edwin Edwards in order to curry favor with federal prosecutors in both Louisiana and Texas. Thus, Cleveland's affidavit reported "less

_____

defendant in a federal criminal case entitled *United States v. James Anthum Collins and Yank Barry*, No. 98-18 (S.D. Tex.). The defendants in that case were the former Executive Director of the Texas Department of Criminal Justice (Collins) and the president of VitaPro Foods, Inc. (Barry). VitaPro sold a high-protein soy product that was used as a meat substitute in penal institutions. The government alleged that Barry paid Collins at least $20,000 to gain approval for a five-year multimillion-dollar contract with the Department of Criminal Justice. Patrick Graham, who solicited business for VitaPro in Louisiana, informed the federal government that the Texas VitaPro deal was a bribe scheme and served as the government's key witness at trial.

[15]Def.'s Mot. Suppress Ex. 5-B, Cleveland Aff. ¶ 15.

than the total story" to Judge Walter.[16]  By omitting information concerning Graham's character and vouching for his trustworthiness, the government created a false impression of Graham's reliability, which likely misled the issuing judge.

In his November 2000 deposition, Irwin, the AUSA who applied for the wiretap order, was asked whether he was aware, in April 1996, that Patrick and Michael Graham were swindlers and "con men" who lacked credibility.  Irwin responded, "We knew what we were buying when we bought into them."[17]  He explained that the Grahams initially approached him through their attorney Charles Blau.[18] After preliminary discussions with Blau, Irwin ran a Lexis/Nexis search and "reams and reams and reams of material came out about Patrick Graham and Michael Graham and the various schemes that they were involved in."[19]  The search certainly would have uncovered the widely reported details of Patrick Graham's January 1996 arrest for accepting a $150,000 down payment on a $750,000 total fee for arranging the escape of a convicted wife-murderer from a maximum-

---

[16]*United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985).

[17]Def.'s Mot. Suppress Ex. 27 at 42.

[18]Blau approached Irwin at a gambling corruption seminar held at the Grand Hotel in Gulfport, Mississippi, on April 19-20, 1996. Irwin was a panelist at the seminar.

[19]Def.'s Mot. Suppress Ex. 27 at 14.

security prison in Texas.[20]  Irwin concluded, from the "reams of material" available to the government, that if the Grahams said, "'It's raining outside,' somebody better go outside and come back wet."[21]

As his deposition makes clear, Irwin reached this conclusion on the Grahams' trustworthiness prior to April 30, 1996, the date that Patrick Graham began cooperating with the government.  Irwin's September 1996 testimony before the bankruptcy court is fully consistent with this early-held opinion of Graham's bad character: "I'm not defending the Grahams as good people; they're not. . . . They're as bad as they come. . . . [T]he things that we're not able to independently corroborate, we believe are lies.  And that's the way it has to be when you deal with the Grahams."[22]  In sum, Irwin's

---

[20]Newspaper articles reporting the January 4, 1996 arrest were available in the Lexis/Nexis database shortly thereafter.  *See, e.g.,* Christy Hoppe, *Prison Developer Accused of Seeking Money to Help Dallas Killer Escape*, DALLAS MORNING NEWS, Jan. 6, 1996, at 1A, *available at* LEXIS, News, Dallas Morning News File (load date: Jan. 8, 1996).  Although Irwin confirmed in his deposition that he knew about the foiled jailbreak plan in April 1996, the wiretap application did not provide Judge Walter with the details of this disturbing crime.  Rather, the government advised only that Graham had been indicted by the Grand Jury in Harris County, Texas, for one count of money laundering and one count of theft by sting.

[21]Def.'s Mot. Suppress Ex. 27 at 47.  Shortly after the Grahams began cooperating with federal authorities in Louisiana, AUSAs for the Southern District of Texas warned Irwin to "[b]e careful, because you're reaching into a bad box of snakes."  *Id.* at 41.

[22]Def.'s Mot. Suppress Ex. 2, 9/16/96 Hr'g Tr. at 30.  Although the bankruptcy-court testimony was given nearly three months after the issuance of the wiretap order, Irwin's November 2000 deposition establishes that the testimony concerning the Grahams' credibility

testimony at his deposition and in the bankruptcy-court establishes that, beginning shortly after his first knowledge of Patrick Graham, Irwin and other federal officials continuously viewed Graham as an unreliable person whose information was worthless in the absence of independent corroboration.

Soon after becoming an informant, Graham proved that the government's distrust of him was justified. In his deposition, Letten characterized the government's deal with the Grahams, which was never reduced to writing, as an "informal cooperation agreement with use/derivative use immunity" covering only offenses committed in Louisiana.[23] The Grahams, however, wanted multistate transactional immunity, and, even though they did not receive it, they represented to others that they had.[24] In a May 23, 1996 letter to Charles Blau, AUSA Peter G. Strasser complained that the Grahams had recently told attorney Dan Cogdell, who was representing Patrick Graham in the Texas jailbreak prosecution,

---

was not based on fresh information but reflected, instead, conclusions that Irwin reached during his April 1996 background research on the Grahams.

[23]Def.'s Mot. Suppress Ex. 28 at 85. Use immunity—also termed use/derivative-use immunity—is "[i]mmunity from the use of the compelled testimony (or any information derived from that testimony) in a future prosecution against the witness." BLACK'S LAW DICTIONARY 754 (7th ed. 1999).

[24]Transactional immunity is "[i]mmunity from prosecution for any event or transaction described in the compelled testimony. This is the broadest form of immunity." BLACK'S LAW DICTIONARY 754 (7th ed. 1999).

that they had "'immunity for (their) actions in Louisiana and Texas,'" a representation that was, in Strasser's words, "simply wrong."[25] Thus, less than one month after Patrick Graham began cooperating, he was already misrepresenting his "deal" in an effort to broaden the scope of the immunity conferred on him by the government.[26]

By virtue of his role in the investigation, Cleveland must have known that Graham had provided false or misleading information about his cooperation/immunity agreement; in fact, Strasser sent Cleveland a copy of his letter to Blau. Yet, in his June 26, 1996 affidavit, Cleveland declared that Patrick Graham "has never been known to provide false or misleading information" since he began cooperating with the government. Because Cleveland may have meant that Graham had not been known to provide false or misleading information *to the government* (Cleveland stated, in the preceding sentence, that Graham "ha[d] provided information to Special Agents of the FBI since April 30, 1996"), that declaration may not qualify

---

[25]AUSA Strasser was Irwin's immediate supervisor and had participated in the initial meetings with Blau and the Grahams. The letter appears in Brown's offer of proof as an exhibit to the November 2000 deposition of James B. Letten. *See* Def.'s Mot. Suppress Ex. 29, Def.'s Ex. 106.

[26]In his November 2000 deposition, Irwin acknowledged the government's initial concern that the Grahams would later mischaracterize the deal: "[D]id I think the Grahams for one minute would come back , try to—to say the deal was something other than what it was? Absolutely." Def.'s Mot. Suppress Ex. 27 at 43.

as a deliberate falsehood, but it is certainly misleading. Cleveland knew that Graham was unreliable and that his mendacious conduct continued even after April 30. In assuring the magistrate that Graham had been truthful with the government for a two-month period, Cleveland suppressed that knowledge and created the false impression that Graham was, in fact, reliable.

As Brown's counsel argues, if the government had disclosed its knowledge concerning the dishonesty and bad character of Graham, the district court may have refused to sign the wiretap order or "requir[ed] the applicant to furnish additional testimony or documentary evidence in support of the application."[27] After all, "it is the magistrate who must determine independently whether there is probable cause . . . ."[28] "He may question the affiant, or summon other persons to give testimony at the warrant proceeding."[29] Much of the information contained in the affidavit, particularly the allegations concerning the genesis of the extortion scheme, was based on the uncorroborated statements of Graham. If the issuing judge gave credence to those statements, he did so in reliance on the false impression that Graham was reliable. Thus, to prevent the affidavit from being misleading, Cleveland should have advised the issuing judge that Patrick Graham

---

[27]18 U.S.C. § 2518(2).

[28]*Franks v. Delaware*, 438 U.S. 154, 165 (1978).

[29]*Id.* at 166.

was untrustworthy and that the government did not believe his uncorroborated statements. The omission of this information from the affidavit reflects intentional misconduct or, at the very least, a "reckless disregard for the truth."[30]

Brown also alleges that Cleveland misrepresented the content of the consensually recorded conversations. There is a substantial showing to this effect with respect to one important segment of the May 8, 1996 conversation between Graham and Brown. In paragraph 30 of the affidavit, Cleveland recites the following from that conversation:

GRAHAM:      . . . Ah, I want EDWIN to be comfortable, okay? I can't afford anything to go wrong with this deal. All right? So we've got to get him, whatever that portion is covered first. . .

BROWN:      Yeah.[31]

This recitation, a product of the government's calculated editing, presents the excerpt as an acknowledgment by Brown that Edwin Edwards would receive a portion of the payment that Brown was seeking from Graham and his partners. In the actual conversation, however, Brown conveyed a much different message. As indicated by the ellipsis mark, Cleveland omitted the statement and question immediately preceding Brown's affirmative response:

---

[30] *Id.* at 155.

[31] Def.'s Mot. Suppress Ex. 5-B, Cleveland Aff. ¶ 30.

-42-

GRAHAM:     . . . Ah, I want EDWIN to be comfortable,
            okay?  I can't afford anything to go wrong on
            this deal.  All right?  So we've got to get
            him, whatever that portion is covered first.
            All I want to do is drag you out and I'm not
            gonna drag you out more than 90 days on yours.
            Okay?

BROWN:      Yeah.[32]

Thus, it appears more likely that Brown was responding to the latter question pertaining to a delay in his payment rather than Graham's first question regarding his (Graham's) desire to make "EDWIN" comfortable.  More importantly, Cleveland did not inform Judge Walter as to the very next words spoken by Brown, which contain a flat denial that any money was going to Edwards:

GRAHAM:     I just don't . . . ah, you know, you never
            have told me what the . . . the . . . the
            sharing ratio is.

BROWN:      He doesn't get any.  I get it all.  I want
            half right away.[33]

During the remainder of their conversation that day, Graham made several other attempts to secure Brown's acknowledgment that Edwards would be receiving a share of the extortion proceeds.  In my opinion, Brown's subsequent inconsistent and ambiguous responses failed to provide an adequate basis for reaching such a conclusion as a matter of probable cause, as opposed to a mere suspicion. Although analyzing the recorded conversations to determine

_____

[32]Def.'s Mot. Suppress Ex. 7, 5/8/96 Tr. at 3.

[33]*Id.*

-43-

Edwards's probable role is ultimately unnecessary to a disposition of Brown's appeal, I conclude that the Cleveland affidavit omitted the facts of Brown's flat denial of the existence of an Edwards portion and Graham's other unsuccessful efforts with reckless disregard for the truth and for the omissions' tendency to mislead the magistrate. By burying this information and offering, in corroboration of Graham's story, an excerpt that was misleadingly edited and taken out of context, the government tried to make the probable cause determination appear uncomplicated. The government should have afforded Judge Walter the opportunity to interpret and weigh Brown's denial and his ambiguous statements within the context of the entire conversation rather than misrepresenting a single excerpt in order to compel the court to decide in its favor.

For the foregoing reasons, I conclude that Brown satisfied the first prong of the *Franks* test by making a substantial preliminary showing that the government intentionally or recklessly omitted facts from the warrant affidavit, causing the information actually reported to be misleading.

Turning to the second prong of *Franks*, Brown is not constitutionally entitled to a hearing unless he shows that the omissions are material.[34] "Identifying intentional omissions and misstatements is not enough . . . ."[35] Our inquiry, then, is

---

[34]*United States v. Meling*, 47 F.3d 1546, 1554 (9th Cir. 1995).

[35]*Id.*

whether the reconstructed affidavit establishes probable cause to believe that Brown had committed or was committing a crime.[36] We reconstruct the Cleveland affidavit by supplying the omissions and setting aside all of Graham's allegations that are not independently corroborated.[37] Because there remains sufficient content in the corrected affidavit to support a finding of probable cause, the district court's judgment must be affirmed.

The Hobbs Act makes it a crime for anyone to obstruct, or attempt to obstruct, commerce by extortion.[38] "The term 'extortion' means the obtaining of [(or attempting to obtain)] property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . ."[39] "Extortion by wrongful use of fear includes fear of economic harm."[40] The excerpts from and summaries of the consensually recorded

---

[36]*United States v. Bankston*, 182 F.3d 296, 305-06 (5th Cir. 1999), *rev'd in part on other grounds*, *Cleveland v. United States*, 531 U.S. 12 (2000). *See also United States v. Stanert*, 762 F.2d 775, 782 (9th Cir. 1985) ("Standing alone, [a defendant's] substantial preliminary showing that the affidavit contained reckless or deliberate falsities and omissions is insufficient to warrant a *Franks* hearing. A defendant challenging an affidavit must also show that the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding of probable cause.").

[37]*See Bankston*, 182 F.3d at 305; *Stanert*, 762 F.2d at 782.

[38]*See* 18 U.S.C. § 1951(a).

[39]*Id.* § 1951(b)(2).

[40]*United States v. Tomblin*, 46 F.3d 1369, 1384 (5th Cir. 1995).

conversations that would appear in the corrected affidavit provide independent corroboration for the following aspects of Graham's story: (1) Cecil Brown was attempting to obtain property (money) from Graham and his associates with their consent;[41] (2) Brown threatened Graham and his associates with economic loss; and (3) Graham's group took the threats seriously, and it was reasonable for them to do so, because of Brown's close relationship with Edwin Edwards. For example, in a June 7, 1996 conversation, which is recounted in the affidavit, Brown warned Graham that he should be receiving a call from the Secretary of the Louisiana Department of Corrections. I agree with Judge Jones that "the import of this threat is clear: The Louisiana Department of Corrections could delay the Jena prison project; and if Graham and his partners wanted their sale to proceed as planned, they should consider increasing the money paid directly to Brown."[42] Moreover, the reconstructed affidavit, taken as a whole, would supply reasonable grounds for believing that Graham and his group feared that Brown would make good on his threats to delay the project if he did not

---

[41]Graham was a Texas citizen representing a Texas corporation, Viewpoint Development Corporation, that had an interest in a private prison project in Louisiana; thus, the "effect on interstate commerce" element of the Hobbs Act was undoubtedly satisfied. *See United States v. Villafranca*, 260 F.3d 374, 377 (5th Cir. 2001) (stating that "the Hobbs Act's required effect on interstate commerce is identical with the requirements of federal jurisdiction under the Commerce Clause").

[42]Op. at 21–22.

receive a satisfactory amount of money. Put differently, the content remaining in the affidavit would establish probable cause to believe that Brown had committed, was committing, or was about to commit a Hobbs Act violation. Because a valid wiretap order could issue on the basis of the reconstructed affidavit, "no hearing is required" under *Franks*.[43]

In conclusion, Brown's offer of proof convinces me that the government knew Patrick Graham was untrustworthy at the time it applied for the wiretap order. It is also evident that the government carefully crafted its application, omitting its assessment of Graham's credibility as well as key facts concerning his misdeeds, in an effort to prevent Judge Walter from reaching a similar view on the issue of Graham's trustworthiness. Furthermore, through intentional or reckless omission, the Cleveland affidavit misrepresented the corroborative strength of at least one excerpt from the recorded conversations. Such conduct falls short of the ethical standards that the government should observe when it seeks authorization to intrude so profoundly on the privacy of its citizens. But these findings are of no benefit to Brown under the *Franks* standard because he failed to show that the reconstructed affidavit is not sufficient to support a finding of probable cause. Perhaps identifying false statements and deliberate or reckless omissions by an affiant that tend to mislead

---

[43]*Franks v. Delaware*, 438 U.S. 154, 172 (1978).

an issuing judge should be enough to entitle a criminal defendant to an evidentiary hearing on a motion to suppress, but the Supreme Court has determined otherwise. Under the rigid test established in *Franks*, the district court properly denied Brown's request.